UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC CABRERA,<br><br>                            Plaintiff,<br><br>v.<br><br>FIFTH GENERATION, INC., a Texas corporation; and DOES 1 through 100, inclusive,<br><br>                           Defendants. | Case No.: 14cv2990 JM(JLB)<br>Related Case No: 14cv2569 JM(JLB)<br><br>**ORDER DENYING DEFENDANT FIFTH GENERATION'S MOTION FOR SUMMARY JUDGMENT** |

      This order addresses Defendant Fifth Generation, Inc.'s ("Fifth Generation") motion for summary judgment filed on August 28, 2015. (Doc. No. 41). The matters were fully briefed and were found suitable for resolution without oral argument pursuant to Local Rule 7.1(d)(1).

      For the reasons set forth below, the court denies Defendant's motion for summary judgment.

## BACKGROUND

      Plaintiff Marc Cabrera ("Cabrera") complains that the labeling of Fifth Generation's product called Tito's Handmade Vodka ("Tito's") is false because, in reality, the vodka is manufactured using mechanized and/or automated processes, which involves "little to no human supervision, assistance or involvement." (Doc. No. 3, ¶¶ 1,

1

33). On December 22, 2014, Cabrera initiated this lawsuit. (Doc. No. 1). On December 24, 2014, Cabrera filed the operative first amended complaint ("FAC") as a putative nationwide class action on behalf of retail purchasers of Tito's during the last four years. (Doc. No. 3). On March 25, 2015, this action was deemed related to <u>Hofmann v. Fifth Generation, Inc. and Does 1-100</u>, No. 14cv2569 (S.D. Cal.) ("the Hofmann action") and was transferred to this court pursuant to the low number rule of Local Rule 40.1. (Doc. No. 18).

Plaintiff alleges that on December 16, 2014, he purchased Tito's at a CVS Pharmacy store in San Diego, California. (Doc. No. 3, ¶ 31). It displayed a label prominently claiming the vodka is "Handmade" and "Crafted in an Old Fashioned Pot Still by America's Original Microdistillery." (Id. at ¶¶ 30, 31). He claims that he saw the label, relied on it, and believed he was buying a superior quality product by virtue of it being made by hand rather than by a machine. (Id. at ¶ 32).

He claims that the Tito's labeling is false and misleading because, in reality, the vodka is mass-produced in large quantities with the use of mechanized and automated machinery, not human hands. (Id. at ¶¶ 2, 16). He quotes a 2013 Forbes magazine article on Tito's that described "massive buildings containing ten floor-to-ceiling stills and bottling 500 cases an hour." (Id. at ¶ 16).

He alleges further that when Fifth Generation represented to the public that Tito's is "Handmade," it concealed the highly automated nature of the manufacture and bottling process. (Id. at ¶ 21). He contends that "Handmade" and "Handcrafted" are terms that consumers have long associated with higher quality manufacturing and high-end products, and therefore, when he and other consumers purchased Tito's, they were under the false impression that the vodka was of superior quality. (Id. at ¶¶ 18, 22).

Consequently, Plaintiff claims, he and other consumers were fraudulently induced to pay inflated prices for vodka they believed was genuinely handmade, when it was not. (Id. at ¶¶ 24, 25). On that basis, he asserts four causes of action under California law: (1) violation of California's False Advertising Law ("FAL"), Business & Professions

2

14cv2990 JM(JLB)

Code § 17500 *et seq.*; (2) violation of California's Unfair Competition Law ("UCL"), Business & Professions Code § 17200 *et seq.*; (3) negligent misrepresentation; and (4) intentional misrepresentation. (Id. at ¶¶ 45–97).

On August 28, 2015, Fifth Generation filed a motion for summary judgment. ("Motion") (Doc. No. ¶ 41). On October 5, 2015, Plaintiff filed an opposition to Defendant's motion ("Opposition") (Doc. No. ¶ 48). On October 9, 2015, Defendant filed a reply ("Reply") (Doc. No. ¶ 49).

## LEGAL STANDARD

A moving party is entitled to summary judgment where "there is no genuine issue as to any material fact . . . ." Fed. R. Civ. P. 56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). While Rule 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials negating the opponent's claim," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), "the moving party bears the burden of proof at trial, [and] it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992).

If the moving party meets its initial burden of production, the burden shifts to the non-moving party to go beyond the pleadings by citing materials in the record to show a genuine issue for trial. Celotex, 477 U.S. at 324 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Nevertheless, the ultimate burden of persuasion on the motion remains with the moving party. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). Doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

///

# DISCUSSION

## A. The Safe Harbor

Fifth Generation first raised its safe harbor argument in its motion to dismiss the related Hofmann Action, where it argued that plaintiff Gary Hofmann's UCL and CLRA were barred by the safe-harbor exception to California's consumer-protection laws. (Hofmann Action, Doc. No. 8, p. 12-13).

In <u>Cel-Tech Communications v. Los Angeles Cellular Telephone Co.</u>, 20 Cal. 4th 163 (1999), the California Supreme Court recognized a safe harbor under the UCL for actions that the law actually bars, or for conduct the law "clearly permit[s]." <u>Id.</u> at 183. The Court explained:

> Although the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination.

<u>Id.</u> at 182. In short, "[a] plaintiff may . . . not plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." <u>Id.</u> (internal quotation marks omitted). The Ninth Circuit has recognized that the safe harbor applies to claims brought under the CLRA. See <u>Alvarez v. Chevron Corp.</u>, 656 F.3d 925, 933–34 (9th Cir. 2011) (applying the safe harbor to a CLRA claim). The Ninth Circuit has also recently extended the safe harbor to protect conduct authorized by regulation. <u>See</u> <u>Davis v. HSBC Bank Nevada, N.A.</u>, 691 F.3d 1152, 1169 & n.8 (9th Cir. 2012) ("California intermediate courts agree with our conclusion that regulations can create safe harbors.").

In its order granting in part and denying in part Fifth Generation's motion to dismiss in the Hofmann Action (Hofmann Action, Doc. No. 15), this court remarked that the dispute with respect to the safe harbor argument centered on what kind of government authorization was sufficient to invoke the safe harbor doctrine. The court rejected Fifth Generation's safe harbor argument for the following reasons: (1) it did not cite any

4

authority to show that the safe harbor extended to information agency action of the type at issue in this case; (2) it did not meaningfully address the distinctions raised by Plaintiff with respect to two relevant cases – <u>Koenig v. Snapple Beverage Corp.</u>, 713 F. Supp. 2d 1066 (E.D. Cal. 2010) and <u>In re Celexa & Lexapro Marketing & Sales Practices Litigation</u>, 2014 WL 866571 (D. Mass. Mar 5, 2014); (3) its claims that TTB specifically investigated and approved of the "Handmade" term were not properly before the court and could not be considered at that stage; and (4) from the regulations it provided to the court and the apparent absence of any guidance from TTB regarding the meaning of the word "Handmade," it was not clear that such representations were necessarily within TTB's regulatory purview.  This court also pointed out that the principles set out in <u>Reid v. Johnson & Johnson</u>, 780 F.3d 952 (9th Cir. 2015), which was decided after the briefing on this matter was complete, were likely to be instructive going forward, since in that case the Ninth Circuit joined the Third Circuit in holding that "[c]reation of federal law should demand at least the same formality for purposes of preemption as it does for purposes of *Chevron* deference." <u>Id.</u> at 964.  In doing so, the Ninth Circuit agreed with <u>Fellner v. Tri-Union Seafoods, L.L.C.</u>, 539 F.3d 237 (3d Cir. 2008), which Plaintiff's case, <u>Koenig</u>, relied on for its conclusion regarding the safe harbor, <u>see</u> 713 F. Supp. 2d. at 1074–75.

In this motion, Fifth Generation reasserts and more fully develops the safe harbor argument previously asserted in the Hofmann action.  First, Fifth Generation argues that the safe harbor doctrine does not have the same formality requirement as the federal preemption doctrine by attempting to make distinctions between the two doctrines.  Second, Fifth Generation contends that TTB's authorization of Tito's label bars Plaintiff's claims under the safe harbor doctrine because (1) a certificate of label authorization ("COLA") is a regulatory approval of a label's compliance with federal law; (2) the COLA for Tito's "Handmade" vodka label triggers the safe harbor doctrine as to any claims based on allegations that the label is misleading; and (3) although not necessary, other evidence establishes that the COLA was issued after TTB overcame any

5

concerns about the word "Handmade."

### 1. The California Safe Harbor and the Federal Preemption Doctrines

Fifth Generation argues that California's safe harbor doctrine prohibits any claims based on conduct that state or federal law has considered and permitted, and does so by attempting to distinguish the California safe harbor from the federal preemption doctrine. First, Fifth Generation argues that while the preemption doctrine is rooted in the Supremacy Clause of the United States Constitution, see Fid. Fed. Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 152 (1982), the safe harbor doctrine was recognized by the California Supreme Court when construing the meaning of "unfair competition" under the UCL, see Cel-Tech, 20 Cal. 4th at 180-82. (Motion, p. 12). Second, while there is a presumption against federal preemption in order to protect traditional state power, see Wyeth v. Levine, 555 U.S. 555, 565 (2009), there is no presumption when applying the safe harbor because it was created by the California Supreme Court based on its conclusion that the legislature did not intend for court decisions about what constitutes unfair competition to prohibit conduct that has been otherwise authorized by law, see Cel-Tech, 20 Cal. 4th at 182. (Motion, pp. 12-13). Third, the Ninth Circuit's refusal to give preemptive effect to agency actions absent a showing of formality of that action is rooted in the requirement of a showing that "Congress intended the agency's pronouncement to carry the binding and exclusive force of federal law," Reid, 780 F.3d at 964, while no such showing of Congressional intent of exclusivity is required in applying the safe harbor, which has been recognized in a spirit of judicial deference to prior state or federal legislative or regulatory action. (Motion, p. 13). Finally, at a later point in the motion, Fifth Generation also argues that Koenig is inapposite to this case "because the Food and Drug Administration has had nothing to do with regulating alcohol beverages since 1976." (Id. at 16).

As this court has already discussed at length in its order denying Fifth Generation's motion for summary judgment in the Hofmann Action (Hofmann Action, Doc. No. 70), Fifth Generation's argument that the alleged distinctions between the safe harbor and the

preemption doctrines render the "formality" requirement discussed in Reid irrelevant to the safe harbor doctrine is unpersuasive. Fifth Generation failed to provide the court with any meaningful explanation as to why the differing origins of the federal preemption and the safe harbor doctrines bear on the issue of whether the formality requirement discussed in Koenig and Reid should be applied to the safe harbor doctrine as well. The court is similarly not persuaded that the presumption against federal preemption and the requirement of Congressional intent of exclusivity distinguish the federal preemption from the safe harbor doctrine to the extent that the "formality" requirement is simply not relevant to the safe harbor doctrine.

### 2. TTB's Authorization of Tito's Label

Fifth Generation next argues that because TTB specifically authorized Tito's label, Plaintiff's claims are barred under the safe harbor doctrine. Namely, Fifth Generation states that TTB has approved every single variation of the labels for Tito's Handmade Vodka, and has done so after questioning and examining the particular term "Handmade" on at least two separate occasions. (Motion, p. 13).

First, Fifth Generation contends that a COLA constitutes a regulatory approval of a label's compliance with federal law and that TTB's alcohol-label approval process is a "formal agency action that results in the creation of a property right in the regulated entity in the form of a COLA." (Id. at 14). Fifth Generation states that TTB's rule-making authority under the FAAA has been delegated from the Secretary of the Treasury, and relies on a district court case, Cruz v. Anheuser-Busch, LLC, for the proposition that it is this delegation that confers upon TTB's regulations, and specifically the COLA, "the exclusive effect of federal law." 2015 WL 3561536, at *4 (C.D. Cal. June 3, 2015) ("[t]he TTB has exclusive jurisdiction in regulating the labels on alcoholic beverages because Congress expressly granted exclusive authority to the Treasury Department who in turn delegated its duties to the TTB."). Fifth Generation further contends that under FAAA and TTB regulations, "no distilled spirit may be bottled or removed from a plant unless the TTB has first issued a COLA approving the bottle labels under the FAAA,"

and that TTB regulations provide specific administrative procedures for challenging an alcohol label that Plaintiff could have, but has not, pursued in lieu of this action. (Motion, p. 14).

Second, Fifth Generation argues that this case is exactly the type of situation for which the safe harbor exists. Fifth Generation relies on Cruz, where the court examined the effect of TTB's COLA, concluding that a COLA has the force of federal law and bars a claim that the approved label is misleading. 2015 WL 3561536, at *6. As in this case, the plaintiff in Cruz brought a UCL claim, alleging that the word "light" on the label for Anheuser-Busch's Rita products was misleading. Id. at *1. Fifth Generation argues that as in Cruz, this court should find that the COLA here has the force of federal law and bars Plaintiff's claims.

Plaintiff counters that the California safe harbor doctrine is inapplicable in this case because the safe harbor primarily prohibits consumer fraud actions where a state or federal statute "actually bar[s]" or "clearly permit[s]" the conduct at issue. Loeffler v. Target Corp., 58 Cal. 4th 1081, 1125 (2014). Plaintiff argues that Fifth Generation overlooks an important distinction between "(1) not making an activity unlawful, and (2) making that activity lawful." (Opposition, p. 6). Here, Plaintiff argues there is no statutory or regulatory language that "clearly permits or requires the conduct complained of by Plaintiff." (Id. at 7). Plaintiff contends that "even if *arguendo* Congress has delegated to the TTB the function of reviewing and approving Defendant's label, this alone does not bring Defendant's conduct within the protection of the safe harbor doctrine." (Id.). This is because TTB's action does not rise to the level of federal law, "much in the same way as preemption," Plaintiff argues. (Id. at 8, citing Koenig, 713 F. Supp. 2d at 1076). Additionally, Plaintiff argues that there is no specific language from TTB allowing Fifth Generation to advertise its vodka as "Handmade." (Id. at 9). Finally, Plaintiff contends that it would "contravene public policy and reason in general to immunize an alcohol manufacturer from consumer fraud suits because the labels of its products had been approved by the TTB." (Id.).

8

In its Reply, Fifth Generation reiterates the differences between the safe harbor and the preemption doctrines, and further counters that there is no question that TTB's COLA procedure "clearly permit[s]" the conduct at issue by distinguishing it from the FDA statements in Koenig. First, Fifth Generation argues that COLA procedures are significantly more formal than the agency letters in Koenig because the issuance or denial of a COLA is the end result of a formal regulatory procedure mandated by law before any label may be used in commerce, and that a COLA, unlike an FDA interpretive letter, creates a property right. (Reply, p. 6). Second, the FDA enforcement in Koenig was "purely discretionary – taking into consideration available agency resources and other priorities," while the FAAA and TTB regulations "*require* the TTB to prohibit statements on labels that are false or misleading." (Id.) Additionally, as argued by Fifth Generation, in Koenig, "the FDA's prior refusal to act on the use of the word "natural" did not amount to a formal approval of the word," while the COLA procedure provided the type of a "deliberative process akin to notice and comment rulemaking . . . ." (Id. at 7, citing Koenig, 713 F. Supp. 2d at 1075-1076).

Having considered the parties' arguments, the court finds that Fifth Generation has not established that TTB's COLA "actually bar[s]" or "clearly permit[s]" the conduct at issue, triggering the safe harbor doctrine. While Cruz did not disagree with Koenig that safe harbor applies only when a regulatory agency conducts a formal regulatory action under Chevron, Cruz summarily held that the issuance of the COLA itself triggered the safe harbor doctrine. This court does not find Cruz persuasive. As this court has already indicated in its order denying Fifth Generation's motion for summary judgment in the Hofmann Action (Hofmann Action, Doc. No. 70), the principles announced in Reid are instructive and stand for the proposition that a federal regulator's actions create a safe harbor only under the same circumstances required for preemption. Those circumstances exist when the agency's actions "[are] the result of a formal, deliberative process akin to notice and comment rulemaking or an adjudicative enforcement action," and are therefore sufficiently formal to merit Chevron deference. Koenig, 713 F. Supp. 2d at 1076. See

1  also Reid, 780 F.3d at 964.  Second, while mindful of Fifth Generation's arguments
2  differentiating TTB's COLAs from the FDA statements in Koenig, these are differences
3  of degree and only establish that COLA procedures are *more* formal than the agency
4  letters in Koenig.  The COLA procedures remain less formal than those required "of a
5  formal, deliberative process akin to notice and comment rulemaking or an adjudicative
6  enforcement action."  See id.   In sum, TTB's action related to its examination and
7  approval of the term "Handmade" on Tito's label, including the COLA it issued, is
8  insufficient to trigger the safe harbor doctrine at this juncture in the case.

### 3. TTB's Determination that "Handmade" is Not Misleading

Fifth Generation argues that while not necessary, the evidence in this case establishes that the COLA was issued after TTB overcame any concerns about the word "Handmade" because (1) TTB specifically raised questions about the word "Handmade"; (2) it thoroughly inspected Fifth Generation's facilities as to every aspect of its operations; and (3) it satisfied itself that the labels were in compliance with its labeling regulations and not misleading.  (Motion, p. 17).  Thus, Fifth Generation submits that "there is no question that the TTB thoroughly reviewed Fifth Generation's facility, distillation process, and essentially every part of its business and concluded multiple times that the labels for Tito's Handmade Vodka – and in particular, the term 'Handmade' – were not misleading."  (Reply, p. 8).

Fifth Generation further details the circumstances under which the COLA was issued in this case, including a letter from Karen Freelove, then-Director of the Advertising, Labeling, and Formulation Division, which states that TTB "[r]eviewed [and] considered all the various information and explanations provided by Mr. Beveridge," including the label in its totality, and after considering all the information, it concluded that the reference to the word "Handmade" was in compliance with the labeling regulations and not misleading.  (Motion, p. 17).  These circumstances, Fifth Generation argues, demonstrate that "the labels for Tito's Handmade Vodka were approved after a rigorous review by officials in the upper echelon of the responsible to

federal agency, ***not mere self-reporting.***" (Id.).

Plaintiff relies on the declaration of Janet Scarlese, the representative of TTB designated to provide sworn testimony in this litigation, for its argument that TTB's approval of alcohol labels "hinges on self-reporting as the truthfulness of the claims appearing on the label is the responsibility of the submitter who signs the [COLA] under penalty of perjury." (Opposition, p. 9). Additionally, Plaintiff contends that TTB had no established criteria or definition for the term "Handmade" when it concluded that Fifth Generation's label complied with federal law. (Id.)

According to Scalese, TTB determined that the term "Handmade" constituted "information that was not required" under 27 C.F.R. 5.33(f), and further explained that it was "the responsibility of the submitter who signs the Certificate of Label Approval Application under the penalty of perjury…." (Beveridge Decl., Exh. 10, p. 44). The relevant portion of the Scalese declaration is as follows:

> There are no standards or regulations that specifically address the use of the term 'handmade.' TTB's labeling specialists do not verify claims such as 'handmade' when they review alcohol beverage labels. These terms are considered additional information, or 'puffery,' covered under 27 CFR 5.33(f). The burden of accuracy of such terms falls on the submitter who is required, under penalty of perjury, to sign the Certificate of Label Approval application. . . . TTB does not have standards or a method to verify statements such as these. They are assumed to be true and correct.

Id. at 45.

Even assuming that TTB did not rely on the truthfulness of the submitter but determined the meaning of "Handmade" on its own, the fact that the term "Handmade" has no definition in TTB regulations, nor any industry standard is significant. Because TTB considers a term such as "Handmade" to be additional information and/or puffery to be verified by a submitter outside the reach of TTB standards or regulations, it appears that a COLA does not sanction such a term, whether it is to be considered as additional information or puffery. This raises a genuine issue as to whether TTB determined "Handmade" not to be misleading, and, if so, whether it was the kind of regulatory action that "actually bars" or "clearly permit[s]" conduct, see Cel-Tech Communications, 20 Cal. 4th at 183. Therefore, at this juncture, given the tension between the Freelove letter

11

and the Scarlese declaration, Fifth Generation has not established that any TTB "approval" of the term "Handmade" should be given the force of federal law, triggering the California safe harbor doctrine.[1]  Further development of the factual record may be helpful in clarifying and resolving this tension.

### B. Negligent Misrepresentation Claim

In addition to the safe harbor argument, Fifth Generation also argues that Plaintiff's negligent misrepresentation claim is barred by the economic loss doctrine.  As correctly pointed out by Plaintiff, this argument exceeds the scope of Judge Burkhardt's amended scheduling order, which provides that "Defendant's anticipated motion for summary judgment *on the safe harbor issue* shall be filed on or before August 28, 2015." (Doc. No. ¶ 36) (emphasis added).  In its Reply, Fifth Generation contends that this argument does not exceed the scope of the scheduling order, as the determination of its safe harbor argument would be dispositive to the negligent misrepresentation claim as well.  (Reply, p. 10, n.6).

If that is in fact the case, Fifth Generation failed to make that argument in its Motion, and instead based its argument on the economic loss doctrine.  (Motion, p. 19).  Only in its Reply did Fifth Generation attempt to connect the negligent misrepresentation claim to the safe harbor argument, erroneously relying on <u>Kallita Air v. Cent. Tx. Airborne Sys., Inc.</u>, 2009 WL 1636036, at *5-8 (N.D. Cal. June 8, 2009) for the proposition that "the economic loss doctrine applies unless there are facts that create a special relationship between the buyer and a seller," and that because TTB defined as a matter of law what the labels for Tito's Handmade Vodka can say, "that decision

---

[1] In his Opposition, Plaintiff also brings forth the argument that the term "Handmade" does not constitute non-actionable puffery, as it is a "specific, measurable, [and] factual assertion that can be proven true or false, and does not fall under the definitions of puffery."  (Opposition, p. 10, n.3). Because this motion for summary judgment was limited to the issue of the safe harbor by Judge Burkhardt's amended scheduling order (Doc. No. 36), the court does not address the question of whether the term "Handmade" constitutes non-actionable puffery outside the context of TTB's determination that the term constituted puffery.

1  effectively precludes any 'special relationship' that would be required for the negligent
2  misrepresentation claim to proceed." (Reply, p, 10, n.6).

3  Fifth Generation cites <u>Kallita</u> for the wrong proposition, since <u>Kallita's</u> holding as to the special relationship test concerned negligence claims, not negligent misrepresentation claims. 2009 WL 1636036, at *5. In fact, as pointed out by Plaintiff in his Opposition and unaddressed by Fifth Generation in its Reply, <u>Kallita</u> specifically notes that "the economic loss doctrine did not apply to Kallita's negligent misrepresentation claim and thus that claim was not barred." Id. at *2. Accordingly, the court rejects Fifth Generation's attempt to connect the negligent misrepresentation claim to the safe harbor doctrine as it lies outside the scope of Judge Burkhardt's order permitting the motion for summary judgment to be brought on the safe harbor issue only. (Doc. No. ¶ 36).[2]

Fifth Generation's motion for summary judgment on the safe harbor issue is denied, and its motion for summary judgment on the intentional and negligent misrepresentation claims are stricken without prejudice.

IT IS SO ORDERED.

DATED: November 20, 2015

_____
JEFFREY T. MILLER
United States District Judge

---

[2] In its Motion, Fifth Generation also argues that Plaintiff's intentional misrepresentation claim fails because "manufacturer's generalized statements of 'quality' or 'superiority' are non-actionable 'puffing' that cannot be reasonably relied upon as the basis for a deception claim." (Motion, p. 20). Fifth Generation does not raise the same argument in its Reply. In any case, Fifth Generation's argument concerning the intentional representation claim, similar to the negligent representation claim, lies outside the scope of Judge Burkhardt's amended scheduling order (Doc. No. 36), and is therefore stricken without prejudice as well.